**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

───────────────────────────────────

MORESE JOHNSON,

                                    Petitioner,

  v.                                                              No. 07-CV-445
                                                                      (LEK/DRH)

JAMES CONWAY, Superintendent, Attica Correctional
Facility,

                                    Respondent.

───────────────────────────────────

**APPEARANCES:**                    **OF COUNSEL:**

MORESE JOHNSON
Petitioner Pro Se
02-A-4312
Attica Correctional Facility
Box 149
Attica, New York 14011

HON. ANDREW M. CUOMO          JENNIFER L. JOHNSON, ESQ.
Attorney General for the            Assistant Attorney General
   State of New York
Attorney for Respondent
120 Broadway
New York, New York 10271

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

**REPORT-RECOMMENDATION AND ORDER**[1]

        Petitioner pro se Morese Johnson ("Johnson") is currently an inmate in the

custody of the New York State Department of Correctional Services ("DOCS") at

Attica Correctional Facility.  Johnson was convicted on October 25, 2002 of

attempted murder of a police officer, reckless endangerment and criminal use of a

──────────────────

        [1] This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.4.

firearm after a jury trial in Albany County and is presently serving an aggregate

determinate term of twenty-eight and one-half years to life in prison.  Johnson now

seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on the grounds that (1)

trial counsel was ineffective during the *Huntley*[2] hearing, (2) the sentence was harsh

and excessive, and (3) a juror should have been discharged and replaced with an

alternate. For the reasons which follow, it is recommended that the petition be denied.


## I. Background

On July 7, 2001, an anonymous caller informed a 911 operator that there was

a black man with a gun wearing a red headband and riding a bicycle at 20 Trinity

Place in Albany, New York.  T. 50-55, 58-62.[3]  Albany Police Officers Sean

Slingerland, Tanya Hansen, and Sgt. Tommy Nadoraski, all in uniform and in marked

police cars, responded to the call.  T. 59-60, 87-89, 169-72, 199. When Officer

Slingerland was within one half block of 20 Trinity Place, he saw Johnson, who was

riding a bicycle in circles.  He was wearing a red headband or bandanna, red shirt,

and jeans. T. 62-63, 93-94. Johnson saw Slingerland and fled.  T. 63-64.  Officer

Slingerland followed but lost sight of Johnson.  Officer Hansen saw Johnson riding his

bicycle on Herkimer Street.  T. 172-73.  She circled the block in an attempt to cut

Johnson off, but also lost sight of him.  T. 172-73.  Officer Slingerland found

---

[2]        People v. Huntley, 204 N.E.2d 179 (N.Y. 1965).

[3]        "T." followed by a number refers to the pages of the jury trial held from
October 21 to 25, 2002. Respondent filed the trial transcript as part of an Index of
State Court Records.  Dkt. No. 8, Exs. D and E.

Johnson's bicycle at the corner of Pearl and Herkimer Streets.  T. 72-73.

Sgt. Nadoraski saw Johnson running down Franklin Alley.  T. 93.  Johnson ran toward the rear of 98 Madison Street and tried to throw a pistol onto the rooftop.  T. 73-74, 80-82, 93, 126-29.  The gun bounced off the wall and fell back to Johnson.  T. 80, 94.  Sgt. Nadoraski drew his weapon and pointed it at Johnson.  T. 99-101.  Johnson was standing behind a four-foot tall bush, obstructing Nadoraski's view of all but his head and shoulders.  T. 100-101.  Johnson bent over and disappeared behind the bush.  T. 101.  When he stood up, he and Nadoraski "locked eyes."  T. 101.  Nadoraski ordered Johnson to "let me see your hands."  T. 101, 139-40.  Johnson looked around, turning his head from left to right, and did not comply. T. 101-102, 152.  Nadoraski repeated the order and Johnson began running toward him.  T. 102, 142-43.

Nadoraski again told Johnson to show his hands.  T. 102.  Johnson raised his arm over the top of the bush, pointed his gun at Nadoraski, and fired a shot.  T. 103, 152.  Nadoraski fired five shots in rapid succession in Johnson's direction.  T. 103, 142, 214-15.  There were two bullet holes in the passenger side rear quarter panel of Nadoraski's police car.  T. 106. Police recovered two 9 mm shell casings near the car, and two projectiles from the lip of the trunk and the fuel line.  T. 106, 224-29.

Johnson ran toward the entrance of the alley, which led to Madison Avenue, and looked back at Nadoraski, still pointing his gun at the officer.  T. 103-04.  Nadoraski radioed that shots had been fired and followed Johnson on foot.  T. 107.  At the same time, Officer Hansen responded to Nadoraski's call.  T. 169-72.  As she neared Franklin Alley, she saw Johnson standing at the entrance to the alley with his

3

back to the street.  T. 175.  She slowed down and reached for her radio as Johnson

turned and pointed his gun at her.  T. 177.  Officer Hansen ducked and accelerated

as she heard a gunshot.  T. 177-79.  The bullet did not strike Hansen or the police

car.  T. 196.  Police recovered a 9 mm shell casing at the entrance to Franklin Alley

on Madison Avenue.  T. 230.

Sgt. Nadoraski was about to peek around the corner of the Franklin Alley

entrance to look for Johnson when he heard the gunshot.  T. 107.  He watched

Johnson run up the street and out of view.  T. 107.  David Vaughn, a neighborhood

resident, walked in front of the alley with his hands in the air, turning slightly.

Nadoraski told him to move out of the way.  T. 109, 155-67.  A Ford Bronco pulled up,

and two men inside told Nadoraski that Johnson ran into 98 Madison Street, a yellow

house with orange trim.  T. 110-11.  Officers set up a perimeter.  T. 111, 181.

Johnson had been dating Sachalie LeCorp, who lived in one of the five

apartments at 98 Madison Avenue. T. 201-202.  Johnson had a key.  T. 204.  LeCorp

was asleep when Johnson came into the apartment at around 4:00 p.m.  He stayed

between five and ten minutes, and then left.  He was wearing a red shirt, red

headband and jeans.  T. 205-06.  Johnson returned to the apartment at around 5:30

p.m., and he and LeCorp took a shower.  T. 204-05.  Johnson appeared nervous, and

several police officers had gathered outside the building.  T. 205-07.  He asked

LeCorp how to get to the roof of the building, and if other residents were home.  T.

207.  Johnson took a hammer and went upstairs.  LeCorp heard banging and

Johnson eventually returned to the apartment.  T. 207-09. Johnson told LeCorp that

he shot at a police officer.  T. 210.

LeCorp started getting phone calls from the City of Albany.  She returned the calls and spoke to a police dispatcher.  T. 209.  Johnson told LeCorp to tell the dispatcher that they had been asleep and did not know what was happening.  T. 209-10.  LeCorp eventually exited the building and Johnson followed minutes later.  Johnson was arrested.  T. 211-12.

Police executed a search warrant at 98 Madison Avenue.  They recovered a red sweat band from underneath the stove in LeCorp's apartment.  T. 234.  A red shirt and red sneakers were found behind the stove.  T. 235.  Police recovered a 9mm handgun from inside a hole in the wall in the third floor hallway.  The gun was wet, and loaded with nine live rounds.  T. 238, 242-43, 247, 273-76.  A firearms examiner determined that the gun was operable.  The two 9mm projectiles recovered from Nadoraski's police car, and the third projectile recovered from Madison Avenue, were fired from the recovered gun.  T. 279-88.

Johnson was transported to the police station, where he was interviewed by Det. Ronald Matos.  T. 312-14.  One of Johnson's hands was cuffed to a three foot length of chain secured to the floor in the interview room.  T. 313-14.  Matos read Johnson his <u>Miranda</u> warnings and Johnson waived them.  T. 314-16, 347-48.  Johnson told Matos that he knew nothing of the shooting and that he was inside 98 Madison Avenue the entire day.  T. 319.  Despite Matos recovering a red thread from Johnson's white t-shirt, Johnson denied wearing any red clothing that day.  T. 319-20.  After about an hour, Matos took a break and exited the interview room.  T. 322, 350.

While Matos was talking to Johnson, Det. Kenneth Wilcox was talking to LeCorp.  T. 322, 358-59.  Wilcox informed Matos of LeCorp's statement, which was

substantially different from Johnson's.  T. 322-23, 358-59. Matos and Wilcox

confronted Johnson with LeCorp's statement, but Johnson continued to deny any

involvement in the shooting.  T. 323-25, 360-62.  The detectives then confronted

Johnson with the fact that police recovered the red clothing and the gun.  T. 324, 362.

Johnson then told police he wanted to change his story.

Johnson stated that he was gambling on a street corner in dice game and had

a problem with someone during the game.  He rode his bike to 98 Madison Avenue to

get his gun and then returned to the dice game.  T. 324-35, 362-64.  The people he

had the problem with were not there, but he fled when he saw a police car.  T. 324,

364.  Johnson admitted trying to throw the gun onto the rooftop behind 98 Madison

Avenue, that he was confronted by Nadoraski, and that Nadoraski told him to freeze

and to show his hands.  T. 325, 364.  Johnson claimed that he tried to surrender by

raising his hands up, but that he was still holding the gun and it accidentally

discharged several times in Nadoraski's direction.  T. 325-36, 364.  He stated that he

ran and heard Nadoraski yelling, and then heard several shots fired, but believed

Nadoraski was shooting in the air because Johnson was not shot.  T. 325-36, 365.

Johnson stated that he hid his clothing behind the stove and tried to hide the gun in

the toilet, but was unsuccessful, so he took it into the hallway and placed it inside a

hole in the wall.  T. 325-26.  Johnson's statement was reduced to writing, and he read

it, confirmed it was truthful, and signed it.  T. 326-32, 351-52, 366-69.

At trial, Johnson testified in his own behalf.  He admitted he possessed the gun

without a license, and that his father, who was in jail, gave it to him for protection.  T.

413, 440, 447-50.  He claimed he never loaded it or checked to see if it was loaded,

because his father assured him it was.  T. 447-49.  Johnson testified he moved to Albany from Brooklyn after his mother died to have a better life, but that since he arrived in Albany, he had been convicted of two felonies and four or five misdemeanors. T. 441-44.

Johnson testified that while he was at the dice game, members of the "Bloods" street gang became angry because they were not allowed to play.  T. 414-15, 451-53, 456.  He was wearing a red bandanna, red shirt, and red and black sneakers, and the gang members asked if Johnson was a gang member and why he was wearing red. T. 415-16, 454-56.  Johnson told them his favorite color was red and that he was not a Blood.  T. 416.  The gang members threatened to rob, cut, and shoot anyone in red, and Johnson went home to get his gun. T. 413, 456-57.  Although he was afraid of the gang members, he returned to the game with his gun but did not see them.  T. 457-58, 460.

Johnson saw the police arrive and fled because he did not want to get caught carrying an illegal gun.  T. 420-22, 461-63.  He dropped his bike, jumped a fence, and ran through his backyard. T. 419-21, 463-64.  When Johnson saw Nadoraski, he tried to throw the gun onto the roof, but it fell back into his hands.  T. 421, 465-66.  He heard Nadoraski tell him to freeze and show his hands, and saw Nadoraski's gun pointed at him.  T. 422, 466-68.  He tried to put his hands up, but Nadoradki "just started firing all crazy."  T. 424, 467.  Johnson claimed he was afraid Nadoraski was going to kill him so, in an effort to protect himself, he returned fire.  T. 424, 468. Johnson ran and claimed that he fired his gun again at the corner of Madison Avenue and Franklin Alley to prevent anyone from following him.  He denied firing at Hansen.

7

T. 424-27, 471-73.

Johnson also testified that he told Det. Matos he would not give a statement and wanted his attorney.  T. 429, 478-80.  According to Johnson, Matos denied his request for a lawyer, and told him that he was going to make a statement and say what Matos wanted him to say.  T. 429-31.  Johnson testified that Matos struck him twice in the chest and ribs, knocking the wind out of him.  T. 430.  Johnson admitted he told Matos he was home all day asleep with LeCorp.  T. 479-80. When Detective Wilcox arrived, Johnson was relieved because Wilcox was a black man and Wilcox assured him he would not be hit while Wilcox was in the room.  T. 432, 481. Johnson admitted he told Wilcox what happened, including that he hid the gun in the wall, and agreed to give a written statement.  T. 475, 482-83.  He assumed Wilcox was writing down everything Johnson said verbatim, but Johnson read only the first line of the statement before signing it.  T. 433-35, 481-84.  Johnson admitted he had several prior false personation convictions for lying to police. T. 436-37.

A Huntley/Wade hearing was held on December 21, 2001.  Dkt. No. 8, Ex. C. The trial court denied Johnson's motion to suppress identification testimony by Officer Slingerland, and denied Johnson's motion to suppress his statement, ruling that it was voluntarily made after Johnson waived his Miranda rights.  Id. at 112-13.  A jury trial was held from October 21 to 25, 2002, and Johnson was convicted of attempted first degree murder (relating to Nadoraski), first degree reckless endangerment (relating to Hansen), and second degree criminal possession of a weapon.  T. 660-61. He was sentenced as a second felony offender to an indeterminate term of twenty-five years to life for attempted murder, a consecutive indeterminate term of

three and one- half to seven years for reckless endangerment, and a concurrent term of fifteen years followed by five years postrelease supervision for the weapon charge. S. 13-14.[4]

On December 15, 2005, the Appellate Division affirmed Johnson's conviction. People v. Johnson, 24 A.D.3d 958, 805 N.Y.S.2d 201 (3d Dep't 2005). Leave to appeal to the New York Court of Appeals was denied on February 24, 2006. People v. Johnson, 845 N.E.2d 1285 (N.Y. 2006).

This action followed.


## II. Discussion

## A. Exhaustion

As a threshold matter, Respondent contends that Johnson failed to exhaust his claims. Specifically, Respondent argues that Johnson failed to present his claims that trial counsel was ineffective and that the sentence imposed was harsh and excessive to the New York Court of Appeals in his leave application. See Dkt. No. 7, Mem. of Law ("Resp't Mem.") at 14-17. Respondent also argues that Johnson's juror dismissal claim is unexhausted because, although it was presented to the New York Court of Appeals, Johnson's claim relied solely on New York law, and his current federal claim was not fairly presented to the New York courts. Resp't Mem. at 16.

An application for a writ of habeas corpus may not be granted until the prisoner has exhausted all remedies available in state court unless there is an "absence of

---

[4]      "S." followed by a number refers to the pages of the December 20, 2002 sentencing transcript. Dkt. No. 8, Ex. B.

available state corrective process" or "circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254 (b).  To satisfy the exhaustion requirement, a petitioner must do so both procedurally and substantively. Procedural exhaustion requires that a petitioner raise all claims in state court prior to raising them in the habeas corpus petition. Substantive exhaustion requires that a petitioner "fairly present" any constitutional claims to the highest state court in the same factual and legal context in which it appears in the habeas petition. Baldwin v. Reese, 541 U.S. 27, 29 (2004); Fama v. Comm'r. of Corr. Servcs., 235 F.3d 804, 808 (2d Cir. 2000); Dorsey v. Kelly, 112 F.3d 50, 52 (2d Cir. 1997) (quoting Picard v. Connor, 404 U.S. 270, 275 (1971)); Daye v. Atty. Gen. of New York, 696 F.2d 186, 191 (2d Cir. 1982); Sweeney v. Superintendent, Watertown Corr. Fac., No. 06-CV-0663, 2007 WL 2176987, at *5 (E.D.N.Y. July 27, 2007).

"To establish that a federal claim was raised in state court, a petitioner must, in the state courts, (1) have relied on federal case law employing federal constitutional analysis; (2) relied on factually similar state cases employing federal constitutional analysis; (3) asserted the claim "in terms so particular as to call to mind a specific right protected by the Constitution"; or (4) alleged a set of facts well within ordinary constitutional litigation." Stone v. Stinson, 121 F. Supp. 2d 226, 236 (W.D.N.Y. 2000)(citing Daye, 696 F.2d at 194). The requirement that the state court have been given a reasonable opportunity to pass on the federal habeas claim is satisfied if the legal basis of the claim made in state court was the "substantial equivalent" of that of the habeas claim. Picard, 404 U.S. at 278; Daye, 696 F.2d at 189-90.  A claim is deemed exhausted when no real avenue remains by which it could be raised.  See

10

Bossett v. Walker, 41 F.3d 825, 828 (2d Cir. 1994).

Johnson filed a direct appeal in which he raised all of his current habeas claims, which were rejected by the Appellate Division.  See Dkt. No. 8, Ex. F, H. Johnson sought leave to appeal the Appellate Division's ruling that the lower court properly denied Johnson's request to remove a juror in the New York Court of Appeals.  See Dkt. No. 8, Ex. I.  Although counsel attached the Appellate Division briefs and appendices, the leave application contained no discussion or reference to the ineffective assistance of trial counsel and sentencing claims.  Id.  Accordingly, these claims were not fairly presented to the New York Court of Appeals, and they are unexhausted.  See Ramirez v. Att'y Gen. of N.Y., 280 F.3d 87, 97 (2d Cir. 2001)("References to attached briefs without more will preserve issues only if the Court of Appeals is clearly informed that the reference is asserting issues in those briefs as bases for granting leave to appeal."); Jordan v. Lefevre, 206 F.3d 196, 198-99 (2d Cir. 2000) ("arguing one claim in [a leave] letter while attaching an appellate brief without explicitly alerting the state court to each claim raised does not fairly present such claims for purposes of the exhaustion requirement underlying federal habeas jurisdiction" ); Grey v. Hoke, 933 F.2d 117, 120 (2d Cir.1991) (holding that where petitioner's leave letter argued one claim and made no reference to other intermediate appellate claims, the fact that he appended his appellate brief to the leave application was not sufficient to present the other claims in the brief to the highest state court); Montero v. Sabourin, No. 02-CIV. 8666, 2003 WL 21012072, at *4 (S.D.N.Y. May 5, 2003)(holding that where counsel attached the appellate briefs but omitted any discussion or specific reference to a summation claim in his leave

11

application to the New York Court of Appeals, the claim was unexhausted).

Johnson's juror disqualification claim is exhausted. Johnson challenged the trial court's decision declining to disqualify the juror on direct appeal, but relied solely on state law.  See Dkt. No. 8, Ex. F, 20-21.  In his leave application, Johnson argued that the Third Department's decision could have "widespread impact in the State of New York."  Id. at Ex. I., p. 1. Johnson did not cite to the Sixth and Fourteenth Amendments, or to federal case law, as he does for the first time in his habeas petition.  He did, however, claim that by refusing to disqualify the juror, the trial court's decision impaired the "integrity of the jury trial process" and affected Johnson's entitlement to a "fair and impartial jury of his peers."  Id.  The reference to New York case law was limited to distinguishing one case (People v. Brace, 259 A.D.2d 782 (3d Dep't 1999)) and analogizing to another (People v. Woodbury, 231 A.D.2d 595 (2d Dep't 1996)).  Id. at 1-2.

The Sixth Amendment provides that in all criminal trials, defendants are entitled to a trial by "*an impartial jury.*"  U.S. CONST. amend. VI. (emphasis added). "Because "[o]ne touchstone of a fair trial is an impartial trier of fact," McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 554 (1984), the right to an impartial jury also implicates due process rights." U.S. v. Perez, 387 F.3d 201, 204 (2d Cir. 2004).  While simply invoking the right to an impartial jury may not alert a state court to a federal constitutional claim, "allegations of improper juror dismissal evoke the Sixth Amendment right to an impartial jury and the Fourteenth Amendment right to due process." Carrasco v. David, No. 00-CIV-5693, 2002 WL 1205750, at *5 (S.D.N.Y. Jun. 4, 2002)(citing Daye, 696 F.2d at 193). The juror disqualification claim

12

presented in Johnson's leave application was the "substantial equivalent" of his habeas claim.  It was based upon the same essential facts and legal doctrine, and asserted the deprivation of a right protected by the Constitution almost verbatim.  The claim was thus sufficient to place the state court on notice of its constitutional dimension. See Sanders v. United States, 373 U.S. 1, 16 (1963); Daye, 696 F.2d at 193.  Accordingly, this claim is deemed exhausted.

## B.  Procedural Bar

There is no longer a state court in which Johnson can raise his ineffectiveness of trial counsel and sentencing claims. He cannot present them to the Court of Appeals in the future because he is entitled to only one leave application.  It would also be futile to raise these claims in a CPL 440.10 motion, because the claims were previously decided on the merits.  See N.Y. CRIM. PROC. LAW §§ 460.10, 460.15, 460.30 440.10(2)(a).  Since no remaining avenue exists in which Johnson could raise these two claims, they are deemed exhausted but procedurally defaulted.   Coleman v. United States, 501 U.S. 722, 732 (1991); Aparicio v. Artuz, 269 F.3d 78, 90 (2d Cir. 2001); Spence v. Superintendent, Great Meadow Corr. Fac., 219 F.3d 162, 170 (2d Cir. 2000).

This Court may review these claims only if Johnson demonstrates cause for the default and resulting prejudice or that the failure of the federal court to review the claims will result in a "fundamental miscarriage of justice" i.e., that he is innocent. Calderon v. Thompson, 523 U.S. 538, 559 (1998); Coleman, 501 U.S. at 748-750. To establish "cause" sufficient to excuse a procedural default, a petitioner must show

13

that some objective external factor impeded his or her ability to comply with the relevant procedural rule.  Coleman, 501 U.S. at 753, Restrepo v. Kelly, 178 F.3d 634, 639 (2d Cir. 1999).  When a petitioner has failed to establish adequate cause for his procedural default, the court need not determine whether he suffered prejudice, since federal habeas relief is generally unavailable as to procedurally defaulted claims unless both cause and prejudice are demonstrated.  Stepney v. Lopes, 760 F.2d 40, 45 (2d Cir. 1985); Long v. Lord, No. 03-CV-0461, 2006 WL 1977435, at *6 (N.D.N.Y. Mar. 21, 2006)(McCurn, S.J.).

Johnson has not established cause.  On October 31, 2007, he filed a Traverse and Memorandum of Law in which he conceded that his sentencing claim was "not reviewable upon the Federal level," and consented to its dismissal. Dkt. No. 12 at ¶4. Johnson then argued that his ineffective assistance of trial counsel claim was properly exhausted because the appellate briefs were attached to the leave application.  Id. at Mem., p. 5-6.  Since simply attaching the appellate briefs is not enough fairly to present the claims to the Court of Appeals, this claim cannot serve as cause. Ramirez, 280 F.3d at 97; Jordan, 206 F.3d at 198-99.

Johnson further argued that the "unintentional and inadvertent failure" to raise the ineffective assistance of trial counsel claim in the leave application was due to "layman litigation, submitted by an inept appellate attorney."  Dkt. No. 12, Mem. at p. 7.  Thus, it appears that Johnson is claiming ineffective assistance of appellate counsel as a ground for cause to excuse the failure to exhaust the ineffective assistance of trial counsel claim. Johnson's bald claim that appellate counsel was "inept" is not pending before this Court because Johnson did not plead a claim of

14

appellate counsel ineffectiveness in his habeas petition.  Even if Johnson had included this claim in his petition, it would be deemed unexhausted because he never raised it in a state coram nobis petition and, because there is no time limit for filing a writ or error coram nobis in state court, that procedure remains available as a state remedy.   Hust v. Costello, 329 F. Supp. 2d 377, 379 (E.D.N.Y. 2004); Garcia v. Scully, 907 F. Supp. 700, 706-07 (S.D.N.Y. 1995). This claim, had it been raised, would therefore have been unexhausted.

In any event, the ineffectiveness of counsel for not raising or preserving a claim in state court will be sufficient to show cause for a procedural default only when counsel was so ineffective that the representation violated the petitioner's Sixth Amendment right to counsel.  Edwards v. Carpenter, 529 U.S. 446, 451 (2000); Aparicio, 269 F.3d at 91. Appellate counsel is required to use professional judgment when deciding to concentrate on a few key issues while eliminating weaker arguments, and is not required to advance every argument urged by the petitioner. Evitts v. Lucey, 469 U.S. 387, 394 (1985); Jones v. Barnes, 463 U.S. 745, 751-52 (1983); Sellan v. Kuhlman, 261 F.3d 303, 317 (2d Cir. 2001).  Here, counsel may have believed that the juror disqualification claim stood the best chance of success and decided to focus on that claim to the exclusion of the others, and that decision would not render counsel ineffective.  Accordingly, Johnson's apparent claim of appellate counsel ineffectiveness may not serve as "cause" for the procedural default. Aparicio, 269 F.3d at 91-92.  Johnson has also not presented any new evidence that he is "actually innocent" of the crimes for which he was convicted.  See Schulp v. Delo, 513 U.S. 298, 327 (1995).

15

In sum, the procedural default bars federal review of Johnson's ineffectiveness and sentencing claims. Even if they were not procedurally barred, no relief is due because they lack merit.

### C.  Standard of Review

When reviewing a habeas petition, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2241.  Relief does not lie for errors of state law.  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); DiGuglielmo v. Smith, 366 F.3d 130, 136-37 (2d Cir. 2004). Johnson may obtain habeas relief by showing that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court."  28 U.S.C. § 2254(d)(1); Carey v. Musladin, 127 S. Ct. 649, 653 (2006); Campbell v. Burgess, 367 F. Supp. 2d 376, 380 (W.D.N.Y. 2004).  "By 'contrary to,' the state court decision may be either contrary to Supreme Court precedent on a question of law or the state court decision is opposite to a relevant Supreme Court case with 'materially indistinguishable' facts." Johnson v. West, No. 04-CV-751, 2007 WL 952058, at *2 (N.D.N.Y. Mar. 29, 2007)(quoting Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).  A state court unreasonably applies federal law when the state court correctly identifies the governing legal rule in a particular case but applies the rule to the facts in an "objectively unreasonable" manner.  Johnson, 2007 WL 952058, at *2 (quoting Lockyer v. Andrade, 538 U.S. 63, 75 (2003)).  The state court's determination of a factual issue is presumed to be correct and the petitioner has the burden of rebutting

that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); <u>DeBerry</u> <u>v. Portuondo</u>, 403 F.3d 57, 66 (2d Cir. 2005); <u>Boyette v. Lefevre</u>, 246 F.3d 76, 88 (2d Cir. 2001).

### D.  Ineffectiveness of trial counsel

Johnson claims that trial counsel was ineffective for failing to suppress his statement.  Specifically, Johnson argues that counsel failed to question Dets. Matos and Wilcox during the <u>Huntley</u> hearing about his request for an attorney or whether they were aware that Johnson had a suspended license charge pending when he was interrogated.  Pet. at 2, Mem. at 8-10; Traverse, Mem. at 9.  Respondent argues that in addition to being procedurally barred, this claim is without merit.  Resp't Mem. at 19-22.

The Appellate Division did not expressly address Johnson's ineffective assistance of counsel claims, instead concluding its opinion by stating, "We have considered defendant's remaining contentions and find them equally without merit." <u>Johnson</u>, 24 A.D.3d at 959.  Even though the state court failed to provide reasoning for its denial of this claim, it disposed of the claim and reduced its disposition to judgment on the merits under § 2254(d), and it is entitled to AEDPA deference.  <u>See</u> <u>Jimenez v. Walker</u>, 458 F.3d 130, 145 (2d Cir. 2006); <u>Sellan</u>, 261 F.3d at 312; <u>Fama</u>, 235 F.3d 804, 810-11 (2d Cir. 2000).

A defendant arguing ineffective assistance of counsel must show that counsel was not functioning as the counsel guaranteed by the Sixth Amendment.  Counsel's performance must have been deficient and that deficient performance must have

prejudiced the defense.  Once this is shown, it cannot be said that the result of the proceeding is reliable. United States v. DeJesus, 219 F.3d 117, 121 (2d Cir. 2000) (citing Strickland v. Washington, 466 U.S. 668,  687 (1984)).  A defendant must demonstrate that counsel's errors were so serious that the defendant was deprived of a fair trial. Strickland, 466 U.S. at 686.  A petitioner cannot establish prejudice simply by demonstrating that counsel's errors only had some "conceivable effect" on the outcome of the case. Strickland, 466 U.S. at 693. Rather, a petitioner must show that absent counsel's errors, the result would likely have been different, considering the totality of the evidence. Id. at 694; United States ex rel. Roche v. Scully, 739 F.2d 739, 742-44 (2d Cir. 1984).

The proper measure of attorney performance is an objective standard of reasonableness in the totality of the circumstances under prevailing professional norms.  Id. at 688; Purdy v. United States, 208 F.3d 41, 44 (2d Cir. 2000).  Strategic choices made after investigation of the relevant law and facts are normally not subject to challenge and the reviewing court must be "highly deferential" to counsel's performance.  Strickland, 466 U.S. at 688.  Additionally, state court findings on such matters are conclusive on the court reviewing the habeas petition if supported in the record.  28 U.S.C. § 2254(d); Sumner v. Mata, 455 U.S. 591, 592 (1982).

A review of the record indicates that Johnson's trial counsel properly represented him in all respects.  Counsel's theory of the case was that Sgt. Nadoraski fired at Johnson first, and that Johnson was justified in firing back.  T. 538-50, 542-46.  In support of that theory, counsel called Johnson as a witness, and elicited testimony regarding his background, the fact that he grew up in a city, and, based

upon that background, believed he would be killed by the officer.  T. 410-16, 526-33, 539-42. Counsel also argued that Johnson's statement was not voluntary but was instead coerced after Johnson was denied an attorney and was struck by Det. Matos. T. 430.  Counsel vigorously cross-examined the prosecution's witnesses.  T. 77-82, 120-53, 163-67, 193-96, 248-62, 264-66, 289-93, 296, 304-308, 337-52, 369-77.  He moved for the disqualification of a juror after learning that she knew Officer Hansen. T. 397-409.  Counsel requested, and was granted, a justification charge, and vigorously argued that lesser included offenses should be submitted.  T. 517-23. Counsel's representation resulted in an acquittal of one of the attempted murder charges.  T. 661.

Nonetheless, Johnson claims that counsel was ineffective at the Huntley hearing because he did not ask questions regarding Johnson's request for an attorney. Johnson further argues that his testimony at trial showed that he "unequivocally invoked his right to counsel at the time of his arrest," and by not pursuing this line of questioning at the hearing, counsel's performance was deficient. Pet. at 2-3, Mem. at 8-10.

"The decision on how best to attack the validity of the confession is certainly one of strategy."  Douglas v. Fisher, No. 04 CIV. 3494, 2004 WL 2914083, at *5 (S.D.N.Y. Dec. 16, 2004)(citing United States v. Javino, 960 F.2d 1137, 1145 (2d Cir. 1992)); see also Dunham v. Travis, 313 F.3d 724, 732 (2d Cir.2002) (quoting United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir. 1987)("Decisions about 'whether to engage in cross-examination, and if so to what extent and in what manner, are ... strategic in nature' and generally will not support an ineffective assistance claim.").

19

At the Huntley hearing, counsel established through cross-examination of Det. Matos[5] that Johnson did not place his initials next to the Miranda warnings on the top page of his statement and argued that the statement was not voluntary.  Id. at 101-102, 104-105.  Counsel did not ask questions regarding whether Johnson requested an attorney, or whether Matos was aware of open charges for which Johnson had counsel.  Instead, counsel cross-examined Matos and Wilcox at trial on these points.  T. 347-49, 370-72.  Counsel also asked Detective Matos if he struck Johnson in the chest and ribs.  T. 349.  Counsel may have decided that Johnson's best chance of challenging the validity of the statement was to present this evidence directly to the jury, especially since it served to set the tone for Johnson's later testimony on these points.  It was within counsel's discretion not to pursue this line of questioning until trial and his failure to do so at the Huntley hearing does not amount to ineffective assistance.  See Douglas, 2004 WL 2914083, at *5 (holding that counsel's decision to argue that petitioner's statement was coerced at trial instead of at a pretrial hearing was a matter of strategy and did not establish deficient performance).

Additionally, Strickland's second prong requires a showing of prejudice, i.e., that there is a reasonable probability that, had counsel asked Matos at the suppression hearing if Johnson requested an attorney, Johnson's statement would have been suppressed. Although counsel did not ask the direct question about whether Johnson requested counsel, he pointed out that Johnson did not initial his Miranda warnings on the written statement, implying that either Johnson was not

---

[5]     Det. Wilcox did not testify at the Huntley hearing.

given his warnings, or that he did not waive them.  Dkt. No. 8, Ex. C, at 105.

Moreover, when asked at trial, Dets. Matos and Wilcox denied that Johnson ever

requested an attorney, or that Johnson told them trial counsel represented him.  T.

347-48, 372.  Had this line of questioning been pursued at the hearing, Det. Matos's

answer, and the outcome of the hearing, would have likely remained the same.  The

suppression court credited Det. Matos's testimony, and Johnson has not established

that the court's credibility determination would have changed had counsel pursued this

line of questioning.  Nor has he established that the statement would have been

suppressed, especially in light of the suppression court's finding that Johnson was

given his Miranda warnings, waived them, and agreed to speak to police.  Dkt. No. 8,

Ex. C, at 112-14.

Finally, the jury was presented with Johnson's version of the events

surrounding the statement, including his claims that he refused to make a statement

without his attorney present, that he told Dets. Matos and Wilcox that he had an

attorney on a suspended license charge, that they would not let him call his attorney,

and that Detective Matos hit him.  T. 429-31, 480-82.  That the jury chose to credit the

detectives' testimony on these points does not establish that Johnson received

ineffective assistance of counsel.  See Figueroa v. Ricks, 378 F. Supp. 2d 210, 222

(W.D.N.Y. 2005)("That the challenged strategy was unsuccessful does not provide a

basis for concluding that defense counsel's performance was unreasonable.").

Johnson also argues that his statement was taken in violation of his right to

counsel.  Specifically, he argues that counsel "could have or should have" inquired at

the hearing about his pending charge because trial counsel represented him on it,

and this line of questioning would have put the detectives and the court on notice of the "existence of counsel at the time of petitioner's arrest."  Traverse, Mem. at 8. Pet. at 2-3, Mem. at 8-9.  Counsel likely recognized that the fact that Johnson had counsel on an unrelated pending suspended license charge had no legal significance as it related to Johnson's voluntariness claim, because a defendant does not have an "absolute right to counsel simply because he is represented by counsel on an unrelated case." Ballew v. Walker, No. 97-CV-0349, 2001 WL 118580, at *3 (W.D.N.Y. Feb. 9, 2001). Counsel likely also knew that New York's prohibition against questioning a suspect about an unrelated crime in the absence of his attorney extends only to a defendant who is in custody for a crime for which he has counsel.  Since Johnson was not in custody on the suspended license charge, the prohibition did not apply.  See People v. Burdo, 690 N.E.2d 854 (N.Y. 1997); People v. Stewart, 670 N.E.2d 214 (N.Y. 1996); People v. Bing, 558 N.E.2d 1011 (N.Y. 1990).

Finally, counsel likely recognized that under federal law, the Sixth Amendment right to counsel is offense-specific and does not attach until formal criminal proceedings are initiated.  Texas v. Cobb, 532 U.S. 162, 167-68 (2001); McNeil v. Wisconsin, 501 U.S. 171, 175-76 (1991).  Since no formal criminal proceedings had been initiated in the shooting against Johnson at the time of his statement, Johnson's federal Sixth Amendment rights were not violated when the police interviewed him. See, e.g., Kirby v. Illinois, 406 U.S. 682, 689 (1972)(holding that formal proceedings include formal charge, preliminary hearing, indictment, information, or arraignment). Counsel cannot be deemed ineffective for not pursuing meritless claims. United

States v. Arena, 180 F.3d 380, 396 (2d Cir. 1999)(holding that counsel's "[f]ailure to make a meritless argument does not amount to ineffective assistance"); Porter v. McGinnis, No. 03-CV-1299, 2007 WL 2789466, at *13 (N.D.N.Y. Sept. 24, 2007)(DiBianco, M.J.)(same).

In sum, Johnson's arguments do not convince this Court that defense counsel's performance at the Huntley hearing was outside the "wide range of reasonable professional assistance," Strickland, 466 U.S. at 689, to which defendants are entitled under the Sixth Amendment. The petition on this ground should be denied.


### E.  Sentence

Johnson next argues that the sentence imposed was harsh and excessive because he was not given an opportunity to engage in plea negotiations and because he had no prior convictions for weapons charges or violent crimes.  Pet. at ¶ 12(b). Respondent counters that, in addition to being procedurally barred, this claim is not cognizable for review because the sentence falls within the statutory range.  Dkt. No. 7, Mem. at 22-23.  In his Traverse, Johnson consents to the dismissal of this claim, conceding that it is not cognizable on review. Dkt. No. 12, Traverse, at ¶ 4.  This Court agrees.

It is firmly established that "[n]o federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law."  White v. Keane, 969 F.2d 1381, 1383 (2d Cir.1992); Mayerhofer v. Bennett, No. 02-CV-0074,

2007 WL 1624767, at *7 (N.D.N.Y. June 6, 2007).  Johnson was convicted of three crimes.  The trial court was authorized to sentence him, as a second felony offender, to a maximum indeterminate term of twenty-five years to life for attempted murder in first degree assault.  N.Y. PENAL LAW §§ 70.02(1)(a), 70.06(3)(b); 110.00/125.27(1)(a)(i).  The trial court was also authorized to sentence Johnson to a maximum determinate term of fifteen years for the second degree criminal possession of a weapon charge.  N.Y. PENAL LAW §§ 70.06(3)(c);265.03(2). Finally, the court was authorized to sentence Johnson to an indeterminate term of three and one-half to seven years in prison for reckless endangerment.  N.Y. PENAL LAW §§ 70.06(3)(d), 4(b); 120.25. While Johnson was sentenced to the maximum term permissible for each crime, his sentence did not exceed it.  Further, the decision to impose consecutive sentences was an appropriate exercise of discretion where, as here, Johnson shot at a police officer and had a lengthy criminal record.  See White, 969 F.2d at 1383; Herrera v. Artuz, 171 F. Supp. 2d 146, 151 (S.D.N.Y. 2001).

Johnson's claim that the trial court abused its discretion when it imposed the maximum sentence because he was denied the opportunity to engage in plea negotiations is without merit, because there is no constitutional right to a plea bargain.  Weatherford v. Bursey, 429 U.S. 545, 560-61 (1977); Miller v. County of Nassau, 467 F. Supp. 2d 308, 321 (E.D.N.Y. 2006)(citing Weatherford).  Johnson's claim that the court abused its discretion because he had no prior weapons or violent felony convictions is not a federal claim subject to review by a habeas court because judges have the authority to exercise broad discretion when imposing sentences. See United States v. Booker, 543 U.S. 220, 223 (2005); Fielding v. LeFevre, 548 F.2d

24

1102, 1109 (2d Cir.1977). Since the imposed sentence was within the statutory range, this theory cannot afford Johnson relief.

Johnson's claim could arguably be construed as a claim that the sentence was cruel and unusual under the Eighth Amendment.  That amendment, however, forbids only extreme sentences which are "grossly disproportionate" to the crime of conviction.  Lockyer, 538 U.S. at 72-73; Harmelin v. Michigan, 501 U.S. 957, 995 (1991). It is well-established that a sentence of imprisonment that is within the limits of a valid state statute is not cruel and unusual punishment in the constitutional sense.  See White, 969 F.2d at 1383; Lou v. Mantello, No. 98-CV-5542, 2001 WL 1152817, at *13 (E.D.N.Y. Sept. 25, 2001).  The Supreme Court has held that, for offenses less than manslaughter, sentences longer than twenty-five years are not grossly disproportionate.  See Staubitz v. Lord, 03-CV-0671, 2006 WL 3490335, at *2 (E.D.N.Y. Dec. 1, 2006)(citing Ewing v. California, 538 U.S. 11 (2003)(twenty-five years to life for grand theft) and Harmelin, 501 U.S. 957 (life in prison without the possibility of parole for cocaine possession)). Johnson's sentence was not contrary to or an unreasonable application of that precedent.  Since the sentence imposed was plainly within the limits authorized by statute, and was not grossly disproportionate to the crime of conviction, this ground of the petition should be denied.

## F.  Juror Dismissal

Johnson next argues that the state court erred when it refused to disqualify a juror after learning that the juror had a past professional relationship with Officer Hansen in violation of his Sixth Amendment right to trial by an impartial jury.  Pet. at

25

4-5, Mem. at 12-16.  Respondent asserts that this claim, in addition to being procedurally barred, is without merit.  Resp't Mem. at 24-25.

A trial court's finding of juror impartiality is entitled to a presumption of correctness. See 28 U.S.C. § 2254; Patton v. Yount, 467 U.S. 1025, 1036-38 (1984). A federal habeas court can only overturn the trial court's finding of juror impartiality for manifest error. Patton, 467 U.S. at 1031 (citing Irvin v. Dowd, 366 U.S. 717 (1961)).  In determining whether a sworn juror becomes grossly unqualified during the course of a trial, the court must "make a reasonably thorough inquiry" of the juror concerning his or her capacity to serve.  See N.Y. C.P.L. § 270.35(2)(a). The standard for removing a sworn juror who is alleged to be "grossly unqualified" is met "when it becomes obvious that a particular juror possesses a state of mind which would prevent the rendering of an impartial verdict." Mikel v. Zon, No. 04-CV-6448, 2007 WL 3076975, at *4 (W.D.N.Y. Oct. 19, 2007)(quoting People v. Buford, 506 N.E.2d 901, 905 (1987)). The trial court's factual determination of whether a juror is grossly unqualified to continue to serve "rests with the trial court and should not be disturbed on appeal absent clear and convincing evidence." James v. Walker, 99-CV-6191, 2003 WL 22952861, at *8 (E.D.N.Y. Aug. 28, 2003)(citing 28 U.S.C. § 2254(e)(1)).

Here, the Appellate Division considered this claim and rejected it, finding that the trial court conducted a "probing but tactful inquiry" of the juror, "which satisfied the court that the juror could serve impartially."  Johnson, 24 A.D.3d at 959.  That finding is supported by the record. T. 397-409.  The trial court questioned the juror at length about her prior relationship with Officer Hansen. The juror explained that she was a

guidance counselor at Albany High School, and that Hansen had been a hall monitor there five years ago.  T. 399, 400-02.  Hansen would flag children who needed mediation, and bring them to the juror's attention.  T. 401.  The relationship was professional. T. 401. The juror explained that as soon as she recognized Hansen, she tried to call the judge's chambers but that she dialed the wrong number, calling the judge's brother's office by mistake.  T. 399, 405.  The juror assured the court that as a guidance counselor, she prided herself on her "non-judgment of people."  T. 400.  She also stated that she continued to serve because she believed she could be fair and impartial despite knowing Hansen, and that she "would have persevered and kept trying [to notify the court] if I felt as though it was an issue." T. 399.  Finally, the juror assured the court that she would not give undue favor either way to Hansen's testimony.  T. 401.

The trial court conducted the required inquiry of the juror, and determined that she was not grossly unqualified to continue to serve because, although the juror knew Hansen, it had no impact on her ability to be fair and impartial.  T. 407-09.  Johnson has not rebutted the presumption of correctness afforded the state court's determination of juror impartiality.  Indeed, Johnson was acquitted of the attempted murder charge relating to Officer Hansen.  T. 661.  Accordingly, the petition on this ground should be denied.

### III. Conclusion

WHEREFORE, based upon the foregoing, it is hereby

27

**RECOMMENDED** that the petition for a writ of habeas corpus (Dkt. No. 1) be **DENIED** and **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e); Roldan v. Racette, 984 F.2d 85 (2d Cir.1993) (citing Small v. Sec'y of Health and Human Servs., 892 F.2d 15 (2d Cir.1989)).

DATED:  December 10, 2007
       Albany, New York

_David R. Homer_

United States Magistrate Judge